**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAMUEL ST. JOHN, | |
| Plaintiff, | Civil Action No. 10-216 (BAH) |
| v. | Judge Beryl A. Howell |
| JANET NAPOLITANO, *Secretary of Homeland Security* | |
| Defendant. | |

## MEMORANDUM OPINION

The plaintiff, Samuel St. John, filed this employment discrimination action when his superiors decided against promoting him from Acting Director to Permanent Director after observing him for one year functioning in the Acting role. The plaintiff alleges the defendant's decision not to promote him was discriminatory and retaliatory under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act, 29 U.S.C. § 633a, *et seq.* Second Am. Compl. ("SAC"), ¶¶ 1, 7, ECF No. 38. The defendant counters that the plaintiff was not promoted for performance reasons. Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. Supp.") at 18, ECF No. 44. Pending before the Court is the defendant's Motion for Summary Judgment, ECF No. 44. For the reasons set forth below, the defendant's motion will be granted.

## I.     BACKGROUND

### A.     Factual History

#### 1.     *The Plaintiff's Employment History*

The plaintiff is a Hispanic man of Mexican national origin born in 1953. SAC ¶ 11; Pl.'s Mem. Opp'n Def.'s Mot. Summ J. ("Pl.'s Opp'n") at 2, ECF No. 52. He worked in what is now

the Department of Homeland Security from 1982 until his retirement in 2010.  *See* SAC ¶¶ 14–16, 32.

In 1982, the plaintiff became an immigration inspector for the Immigration and Naturalization Service where he "processed applicants for admission" and "interviewed them in Spanish."  Dep. of Samuel St. John ("Pl.'s Dep."), Pl.'s Opp'n Ex. 16 at 12:5–16, ECF No. 52-3. After five years, the plaintiff moved his employment to the U.S. Customs Service in El Paso, Texas, where he served in a variety of positions for three years.  *See id.* 15:2–16:22. In 1991, the plaintiff was transferred to Customs Headquarters as a Fines, Penalties and Forfeiture Specialist, a position in which he served for another five years.  Pl.'s Aff. Statement of Material Facts ("Pl.'s SMF") at ¶ 3 ECF No. 52.  In 1996, the plaintiff moved to the Office of Commercial Operations,[1] where he served as a field operations specialist working on international trade agreements.  Pl.'s Dep. at 25:3–21, ECF No. 52-3.

While working as a field operations specialist, between 1997 and 2001, the plaintiff applied for several GS-14 positions but was not promoted.  *Id.* at 27:16–22.  The plaintiff filed "some EEO complaints," beginning in 1997, approximately a year and a half after he began working as a field operations specialist.  *See id.* at 24:22–25:2 (stating the plaintiff started specialist position in "early 1996"); Pl.'s Opp'n Ex. 48 ("Individual Complaint of Employment Discrimination" received on June 3, 1997) at 277, ECF No. 52-4 (reflecting plaintiff's complaint of discrimination for national origin discrimination and retaliation for "past and present union activities").  The plaintiff subsequently filed additional EEO complaints on May 4, 1998, October 29, 1998, and December 2, 1998.  *See* Pl.'s Opp'n Ex. 48 *generally.*  A common theme in these complaints concerned the fairness of the panels that did not select him for promotion to

---

[1] The Office of Commercial Operations later became the Office of Field Operations. Pl.'s Dep. at 25:6–8, ECF No. 52-3.

the GS-14 level due to alleged retaliation by the employee "who determines the make-up of the rating pannel [sic]." *Id.* at 280; *id.* at 282 (plaintiff stated he "made the [Best Qualified List ("BQL")] list on several occasions but have not been selected"); *id.* at 284 (plaintiff "continue[d] to make the BQL list" but "[t]he Office of Field Operations also continues to manipulate the composition of the rating panel in order to get panelist that will score [the plaintiff] low and score their candidates high.").

In April 1999, the plaintiff was promoted to a GS-14 level customs inspector in the CBP's Office of Internal Affairs.[2] He remained in that position until he joined the Container Security Initiative ("CSI") in 2004. *See* Pl.'s SMF ¶ 8. CSI is one of nine programs in the Cargo and Conveyance Security ("CCS") division, which is part of the CBP's Office of Field Operations. Supplemental Declaration of Todd Owen ("Owen Supp. Decl.") ¶¶ 1–2, ECF No. 44-5. Other CCS programs relevant to this case include the Customs-Trade Partnership Against Terrorism ("C-TPAT") and Secure Freight Initiative ("SFI"), the directors of which reported to the Executive Director of CCS, Todd Owen ("Owen"). *Id.* at ¶ 2.

The CSI is designed to "target and screen high-risk containers of cargo before they depart from foreign ports in order to stop threats to the security of the supply chain. Pl.'s SMF ¶ 6; *see also* Def.'s Statement of Material Facts Not in Dispute ("Def.'s SMF") ¶ 7, ECF No. 44. "CSI is a partnership with foreign governments that permit CBP and DHS personnel . . . to be present at 58 foreign ports." Owen Supp. Decl. ¶ 7. C-TPAT is a larger program that works primarily with

---

[2] According to the plaintiff's counsel, the plaintiff was "unable to get promoted to the GS-14 level until he filed these EEO complaints, which were settled in his favor in 2001." Pl.'s SMF ¶ 70. In the portions of the plaintiff's deposition cited in the plaintiff's Statement of Material Facts, the plaintiff stated he was promoted after he filed the complaints and that a separate complaint, not provided to the Court, regarding an incident in 1994, was eventually settled in the plaintiff's favor in 2002. *See* Pl.'s Dep. at 27:14–22; 166:7–21, ECF No. 52-3. Although it appears the plaintiff's promotion occurred after he had filed the four EEO complaints, there is nothing in the record to indicate his promotion was part of any remedial action for his prior EEO complaints or was otherwise the result of these complaints. Furthermore, it does not appear the plaintiff was ever awarded the relief he sought in those complaints, namely, "back pay and interest" to 1996 and immediate promotion. Pl.'s Opp'n Ex. 48 at 280, 282, 284.

the "private sector trade community" to inspect "all aspects of the compan[ies'] supply chain." *Id.* at ¶ 5. Where C-TPAT addresses all parts of supply chain security, CSI focuses on "one node of the supply chain – targeting high risk cargo and the screening of that cargo before it is loaded on U.S. bound vessels." *Id.* at ¶¶ 5, 7.

The plaintiff was chosen to join CSI by Allen Gina, then the "Senior Executive Service level Executive Director of CSI," Pl.'s SMF ¶ 8, because, *inter alia*, the plaintiff was viewed as "very competent, very conscientious." Dep. of Allen Gina, ("Gina Dep."), Pl.'s Opp'n Ex. 17, ECF No. 52-3 at 78:15. Within a year of his joining CSI, he was promoted to Branch Chief of Strategic Planning and Development "for the same reasons . . . why we hired him." *Id.* at 81:17–82:3. As branch chief, the plaintiff supervised between ten and fifteen people. *Id.* at 93:1–3. During his CSI tenure, the plaintiff consistently received perfect performance ratings from his supervisors. *See* Pl.'s SMF ¶ 14; Pl.'s Opp'n, Exs. 9, 20, 21, ECF Nos. 52-3; 52-4.

### 2. The Plaintiff's Appointment To And Performance As Acting Director

In December 2007, the plaintiff was appointed Acting Director of CSI "after that position was temporarily vacated by Marsha Wiggins." Def.'s SMF ¶ 13. According to Wiggins, the plaintiff was appointed Acting Director because he "knew the program . . . [and] had acted [as Director temporarily] before." Dep. of Marsha Wiggins ("Wiggins Dep."), Def.'s Mot. Dismiss Ex. 6 at 90:16–17, ECF No. 44-7. Notably, Wiggins opined that any of the three branch chiefs (of which the plaintiff was one) "would have been expected to be able to step into [the] role," but one branch chief was an Immigrations and Customs Enforcement ("ICE") Agent on temporary detail to CBP, Def.'s SMF ¶ 15, and another had "a much broader responsibility" than the plaintiff. Wiggins Dep. at 90:8–16, ECF No. 44-7. Wiggins therefore considered the plaintiff to "be the logical recommendation" for Acting Director. *Id.* at 90:17–18. The plaintiff's second

level supervisor, Owen, as Executive Director of CCS, approved Wiggins' recommendation. Pl.'s SMF ¶ 18, Dep. of Todd Owen ("Owen Dep."), Pl.'s Opp'n Ex. 4 at 53:10–11, ECF No. 52-3. According to Owen, Wiggins "indicated [the plaintiff] was the strongest of the branch chiefs" within CSI. *Id.* at 53:1–9.

The plaintiff served as the Acting Director of CSI for approximately one year. Pl's SMF ¶¶ 18–19. During that time, the plaintiff's supervisor noted at least eight separate occasions when the plaintiff was notified of a deficiency in his performance. *See* Def.'s Reply Pl.'s Opp'n to Def.'s Mot. Summ. J. ("Def's Reply") at 2–4, ECF No. 55. None of these deficiencies, however, rose to the level of requiring that the plaintiff be removed from his Acting position. Owen Dep. at 116:9–10, ECF No. 52-3. Owen told the plaintiff he was generally satisfied with the plaintiff's management of the CSI program, *id.* at 144:2–5, and approved a cash bonus award of $2,000 to reflect the plaintiff's "competent" management of CSI while the plaintiff was Acting Director. *See* Owen Supp. Decl. ¶ 24. This bonus amount awarded to the plaintiff was only half the bonus given to several other employees whom Owen supervised and were in equivalent positions to the plaintiff. *Id.*

The defendant's concerns with the plaintiff surfaced almost immediately after the plaintiff began his temporary assignment as Acting Director. In an email, dated February 2, 2008, less than two months after the plaintiff was named acting director, Richard DiNucci ("DiNucci"), the Director of the SFI (another CCS program), emailed the plaintiff's then direct supervisor, Owen, complaining that the plaintiff "directed that his Team Lead in Egypt, CBPO [redacted], not participate in the SFI meetings in Alexandria. I will be kind and say that this is at best not conducive to managing either program properly . . . I apologize for raising this to you on a weekend, but [the plaintiff] has the clear idea that any cross-utilization of resources or

cooperation is somehow not good management." Declaration of Frislanda Goldfeder

("Goldfeder Decl.") Ex. J at 87, ECF No. 44-3. Owen had to step in and direct the plaintiff "to

assist SFI." Owen Supp. Decl. ¶ 23. Apparently, the problem was ongoing; the subject line of

the email exchange between Owen and DiNucci was "SFI CSI Again." Goldfeder Decl. Ex. J. at

87.

Two weeks later, on February 17, 2008, Owen emailed the plaintiff that Owen should

have been notified in a timely manner about a hospitalized CSI officer, instead of learning about

the situation almost a week later through other channels. Goldfeder Decl. Ex. N at 101, ECF No.

44-3. A similar situation arose in April, 2008, when Owen told the plaintiff, in reference to a

CSI employee being sent home early from an overseas temporary duty assignment due to

misconduct, that Owen "should be hearing about it from [the plaintiff], not from the [Director of

Field Operations] . . . [Owen] should not be in the dark on such matters." Goldfeder Decl. Ex. O

at 103, ECF No. 44-3. Although the plaintiff responded to this criticism by asserting "[i]t will

not happen again," Owen reprimanded the plaintiff via email again in December, 2008 for failing

to notify Owen in a timely manner when a CSI officer was involved in a shooting incident. *See*

Goldfeder Decl. Ex. P at 107, ECF No. 44-3 ("Why was I not called by you? This is not good.").

In addition to communication and notification problems regarding issues within the

plaintiff's chain of command, Owen was concerned about the plaintiff's interactions with his

peers. In an email exchange, DiNucci responded to the plaintiff's objection to one of his

employees assisting SFI by noting "the [executive director's] message was clear that cooperation

is seamless in CCS and that there is no program wall of separation." Goldfeder Decl. Ex. I. at

85, ECF No. 44-3. Over the course of the exchange, DiNucci eventually referred the plaintiff to

Owen, who had approved the plaintiff's employee's designation, in the face of the plaintiff's continuing objections. *Id.* at 84–85.

The plaintiff was also criticized for failing to cooperate with a request to assist a Congressional delegation visit. *See* Owen Dep. at 110:14–114:13, ECF No. 44-6. The plaintiff informed an employee that "[u]nder no circumstances should your team in Rotterdam be making any transportation arrangements for the upcoming Congressional Staff delegation . . . Please advise your team that unless they get a call from you or [the plaintiff] directly, they are NOT to arrange airport transportation." Goldfeder Decl Ex. L, ECF No. 44-3, at 92 (emphasis in original). Owen pointed out to the plaintiff that this "was a bigger issue of supporting the overall agenda of CBP and a parochial view" the plaintiff had. Owen Dep. at 113:3–5, ECF No. 44-6. Specifically, Owen was concerned that the plaintiff had missed "an opportunity to further advance the work of CSA by establishing a good relationship with" the congressional staffers. *Id.* at 112:15–17. Similarly, on another occasion, the plaintiff was advised against raising objections to the use of CSI personnel to assist in a visit to Argentina by the CBP Commissioner. *See* Goldfeder Decl. Ex. K at 88–89, ECF No. 44-3.

The plaintiff's supervisor had to intervene in a dispute between the plaintiff and the Assistant Commissioner of the CBP, Allen Gina, because the plaintiff declined to accede to Gina's request to station an employee at a new intelligence operations center instead of headquarters. *See* Goldfeder Decl. Ex. M at 95–99, ECF No. 44-3; Gina Dep. at 222:19–223:2, ECF No. 44-7. Owen also chaired a meeting to address "issues" raised by another of the plaintiff's peers, Frank Jaramillo, who served as the Director of another component of CCS, about the plaintiff's management of CSI, including disagreements about staffing, integration,

working collectively, using resources efficiently and "not working in stovepipes." Def.'s Reply Ex. 1 at 60:16–63:16, ECF No. 55-2.

Finally, the plaintiff's supervisor had to remind the plaintiff he was not entitled to take over the Director's office space when he was only temporarily assigned to the position, which was a "protocol deficiency." Owen Dep. at 114:17–115:6, ECF No. 44-6.

### 3. *The CSI Director Position*

The plaintiff's complaint stems from his unsuccessful attempt to become the Director of CSI, which is a GS-15 level position. *See* SAC ¶ 6. Vacancy notices were posted for the position twice, once in June, 2008 and again in October, 2008, that described the duties and responsibilities of the position. *Id.* ¶¶ 19, 26. Specifically, the announcement informed applicants that the Director of CSI was expected to, *inter alia*, "manage organizational changes as well as changes to the content of the program;" "identify and resolve unique issues where no policy exists and take innovative actions to address new needs and/or issues;" and "serve as a representative of and advocate for the program in dealings with high-ranking officials in other Federal agencies, top-level managers in the agency, and various governing board and committees." Goldfeder Decl. Ex. A at 6, ECF No. 44-3.

The announcement also spoke directly to the extensive interpersonal skills required for the position. *Id.* It informed applicants that the CSI Director would be required, *inter alia*, to "make decisions on work problems presented by subordinate supervisors;" "exercise significant authority in dealing with officials of other units/organizations and in advising management officials of higher rank on operational issues;" and "evaluate subordinate supervisors and serve as the reviewing official on evaluations of non-supervisory employees rated by subordinate supervisors." *Id.*

Several defense witnesses indicated that there is a substantive difference between the work the plaintiff was performing as a branch chief, a GS-14 position, and the work expected of the CSI Director, a GS-15 position. The plaintiff's former direct supervisor, Marsha Wiggins, for example, stated that "[t]here's a big difference between a [GS-]14 and a [GS-]15" and noted she didn't know if the plaintiff had the requisite leadership skills for the higher position. *See* Wiggins Dep. at 90:20–91:8, ECF No. 44-7. Owen, the plaintiff's direct supervisor when the plaintiff became Acting Director, noted it was his "contention at the [GS-]15 level, it's not about technical knowledge, but it's about leadership." Owen Dep. 171:12–13, ECF No. 52-3. Jayson Ahren, a former CBP Acting Commissioner, summed up the difference between GS-14s and GS-15s as a "cut" between leadership positions and lower level positions:

> You had some great program officers and program managers that had no business becoming GS-15s. Just because they had performed well as a 14 or as a 13 doesn't mean they're going to perform well as a 15 and that you want to really be able to find someone who's got that leadership potential to be able to go to that next level of the organization because to me that's where the cut is made going forward. Talked about the number of 15s but the number of 14s is several times more than the number of 15s. When you get into managing and directing, that GS-15 really becomes the leadership position which I believe is the cut.

Dep. of Jayson Ahern ("Ahern Dep."), Def.'s Reply Ex. 6 at 67:4–16, ECF No. 55-2.

### 4. *The June 2008 CSI Director Opening*

In June, 2008, the CBP posted the first vacancy notice for the permanent CSI Director position. *See* Pl.'s Opp'n Ex. 26 at 104–10, ECF No. 52-4. At this time, the plaintiff had been serving for approximately six months as Acting Director. The plaintiff applied for the position and received a perfect score on the computer generated occupational assessment questionnaire portion of his application. Pl.'s Opp'n Ex. 28 at 129, ECF No. 52-4. The plaintiff's name was listed among seventeen candidates on the Merit Promotion Certificate of Eligibles (also known

as the Best Qualified List or BQL), from which "[a]ny candidate on the list" could be selected for the position. *See* Pl.'s Ex. 27-S at 3–5, ECF No. 53-11 FILED UNDER SEAL.

Owen was the "recommending official for the selection of a CSI director" and Deputy Assistant Commissioner Winkowski ("Winkowski") was the selecting official. Owen Dep. at 126:1–5, ECF No. 52-3. Owen's "recommendation would go to the deputy assistant commissioner and then on to the commissioner for approval." *Id.* at 135:11–13. Owen noted that "the assistant commissioner relied on the recommendations put forth by his senior staff," presumably referring to himself. *Id.* at 140:14–19. Owen declined to make a selection from the list of eligible names presented to him from the June vacancy list "without seeking input or approval from anyone, as was [his] prerogative." Owen Supp. Decl. ¶ 12. The plaintiff stated that "the top three candidates . . . were all racial minorities."[3] Pl.'s SMF ¶ 23; Pl.'s Ex. 29 at 2, ECF No. 53-12, FILED UNDER SEAL. Of the seventeen candidates not chosen, twelve were non-minority candidates. *See* Pl.'s Ex. 29.

The plaintiff expressed his disappointment to Owen when he learned in August that he was not selected for the permanent CSI Director position. Pl.'s SMF ¶ 24; Owen Dep. at 143:14–16, ECF No. 52-3. He asked Owen why he was not selected for the position and Owen responded that he was "happy with your work, you're doing an excellent job." Pl.'s Dep. at 114:4–7, ECF No. 52-3. Owen recalls telling the plaintiff he was "managing the program effectively." Owen Dep. at 144:1–5, ECF No. 52-3. The plaintiff also recalls Owen telling him that the selection decision was "out of my hands" and that "Winkowski wants, you know,

---

[3] Although the plaintiff implies that the list of eligible candidates provided to Owen was ranked in some merit order the list did not reflect any of the candidates' scores on the occupational assessment questionnaire. *See* Owen Dep., ECF No. 52-3, at 174:7–9 ("For that announcement, [the plaintiff] was Number 1 on the list. There was [sic] no scores associated with that announcement."). No evidence is in the record about how the list of eligible candidates was sorted and whether the first candidate to appear on the list was the highest scoring candidate on the occupational assessment questionnaire.

somebody that . . . hasn't been with the CSI program since the inception." Pl.'s Dep. at 114:8–11, ECF No. 52-3. Owen recalls telling the plaintiff "about the benefits of having a fresh perspective on programs, about the benefits of moving throughout your career, not spending too much time in one program . . . . As part of that discussion, I remember indicating that I felt the assistant commissioner would be looking at those types of different opportunities when he makes selections." Owen Dep. at 177:18–178:3, ECF No. 52-3.[4]

After this August, 2008, conversation with Owen, the plaintiff called an EEO counselor and said "I put in for this CSI director position and I got a notification from the Minneapolis hiring center that no selection was made and I want to file a complaint." Pl.'s Dep. 116:17–24, ECF No. 44-6. He apparently did not do so because he was told by the EEO counselor that he could not file a complaint "because no selection was made." *Id.* at 116:24–25.

In or around August, 2008, the plaintiff first advised Owen that he had filed discrimination complaints in the past. *See* Pl.'s Dep. at 119:8–25, ECF No. 44-6. Specifically, the plaintiff was concerned about Winkowski's involvement in the selection process for CSI Director because "Winkowski was working with Mr. Winwood," a former CBP employee against whom the plaintiff had raised a complaint in 1994. Pl.'s Dep. at 212:8–9, ECF No. 44-6. The plaintiff "brought it to the attention of Mr. Owen, [he] said, does it have anything to do with the EEO complaint that I filed against Chuck Winwood, and I didn't – I don't remember getting a response from – from Mr. Owen other than that Mr. Winkowski did not want anybody that had been working for CSI since the inception." *Id.* at 212:11–17. The plaintiff does not "believe [he] went into the specific [sic] as to . . . what the complaint was about." *Id.* at 213:6–7. Owen confirms that the plaintiff "volunteer[ed] information" about the plaintiff's "prior EEO activity" but he does not recall that the plaintiff "provided any specifics about his prior EEO activity other

---

[4] The parties' specific accounts of this conversation differ slightly but are generally consistent in message.

than stating that he felt he was being held back from future promotions because [Assistant Commissioner] Ahern was displeased over a prior EEO matter." Owen Supp. Decl. ¶ 18.

### 5. *The Plaintiff Applies For And Is Appointed To A Position In El Paso*

In May, 2008, approximately one month before the first vacancy notice was posted for the CSI director position, a vacancy was announced for a GS-14 Border Security position in El Paso, Texas. Goldfeder Ex. S. at 127, ECF No. 44-3. This position entailed "unify[ing] antiterrorism enforcement efforts within an assigned geographic area and among the ports under the purview of the Field Operations Office assigned. Specifically, [the position holder] will coordinate enforcement efforts with Headquarters, other Field Operations Offices, and appropriate personnel within the U.S. Immigration and Customs Enforcement (ICE) and other federal and non-federal agencies and measure the productivity of these efforts." *Id.* at 128. The plaintiff was born and raised in El Paso, owns a home there, and has family there. Pl.'s Dep. at 8:15–17; 109:2–24, ECF No. 44-6. On June 6, 2008, before the vacancy announcement for the CSI Director position had issued, the plaintiff sent an email to a coworker asking her to "put in a good word for [him]" with Ana Hinojosa ("Hinojosa"), the person responsible for making a selection recommendation for that position. Goldfeder Decl. Ex. T at 135–36, ECF No. 44-3. At the time, the plaintiff states he knew the CSI Director position would be opening soon. *See* Pl.'s Dep. at 107:7–9, ECF No. 44-6.

The plaintiff's coworker gave Hinojosa "input . . . significantly raving about [the plaintiff] and his qualifications in [the co-worker's] work with him." Dep. of Ana Hinojosa ("Hinojosa Dep."), Def.'s Reply Ex. 3 at 106:10–12, ECF No. 55-2. Hinojosa "was very interested in kind of getting a look to see what kind of candidate he was at" the 2008 CSI Targeting Conference, for which the plaintiff was a "co-host." *Id.* at 99:18–22; 106:12–14. At

the conference, Hinojosa "was not very impressed by [the plaintiff's] presentations. [She] thought [the plaintiff] was maybe a little too familiar – using too familiar of a conversation tone with the audience. [She] felt that the audience was comprised of international representatives from different countries, and I thought that maybe a more formal style would have been more appropriate for headquarters representatives." *Id.* at 47:13–21. Initially, these observations stopped Hinojosa from recommending the plaintiff for the El Paso position. *Id.* at 47:22–48:4. She eventually changed her mind, however. *Id.* at 48:5–7.

The plaintiff was selected for the El Paso position "on or about October 1, 2008." Def.'s SMF ¶ 78; *see also* Goldfeder Decl. Ex. V. at 142, ECF No. 44-3 (showing October 1, 2008 date for selecting official's signature on document indicating selection of plaintiff). The plaintiff sent an email accepting the conditional job offer on October 20, 2008. Goldfeder Decl. Ex. W at 145, ECF No. 44-3. The plaintiff was told his effective date for the new position would be January 4, 2009. *See id.* at 144.

While in El Paso, Hinojosa noted the plaintiff did "a fantastic job" as a GS-14 border security coordinator. *See* Hinojosa Dep. at 104:9, ECF No. 55-2. She noted that the plaintiff "does not have any problems forming an opinion, and I think that he defends his opinion well, on a couple of occasions maybe a little bit longer than I would have expected him to defend his opinion." *Id.* at 104:3–7. Hinojosa also noted that, though she had never worked at CBP headquarters, her "assessment would be that there are a lot of different factors that need to be taken into consideration when you're working at the headquarters level, not the least of which would be the political implications of making policy decisions, and that requires a different level of finesse-ness." *Id.* at 104:21–105:5. Based on Hinojosa's observations, the plaintiff "did a

great job for me in the context of the job that he was doing.  I'm not sure how well he would do in the context of politics and what is required of the headquarters level." *Id.* at 105:13–17.

### 6. *The October 2008 CSI Director Opening*

On October 13, 2008, after the plaintiff had been notified about his selection for the El Paso position, a new GS-15 Program Manager vacancy was announced.  *See* Goldfeder Decl. Ex. D at 24–30, ECF No. 44-3; Def.'s SMF ¶ 27.  Owen sent an email to the plaintiff and six of his peers mentioning the announcement and noting "[f]rom this announcement [he] hope[d] to fill the CSI and Trade Operations Division directors."  Goldfeder Decl. Ex. E. at 32, ECF No. 44-3.  He also asked the plaintiff and his peers to "ensure maximum distribution among your eligible staff."  *Id.*

Once the vacancy was posted, the plaintiff went to see Owen.  Pl.'s Dep. at 77:5, ECF No. 52-3.  The plaintiff informed Owen that he intended to apply for the CSI position again and, according to the plaintiff, Owen told him "don't bother, you're going to El Paso."  *Id.* at 77:7–8.  The plaintiff states he told Owen "I don't want to go to El Paso." *Id.* at 8–9.  Owen recalls "asking [the plaintiff], I thought you had accepted the El Paso position.  And [the plaintiff] affirmed he did accept the . . . as I recall, said yes, he accepted the El Paso position, but [the plaintiff] still felt strongly about applying for the next CSI position."  Owen Dep. at 145:14–19, ECF No. 52-3.  The plaintiff states Owen again told the plaintiff that "the decision was out of his hands and blamed his supervisor (Assistant Commission [sic]) Winkowski)."  Pl.'s SMF ¶ 43.  Owen does not recall this portion of the conversation.  Owen Dep. 145:21–22; 146:1–7, ECF No. 52-3.

The plaintiff applied for the position, as did Daniel Stajcar ("Stajcar"), the person whom Owen eventually recommended to be the new CSI director.  Pl.'s SMF ¶ 42.  Stajcar is a "non-

Hispanic white male, with no prior EEO or protected activity who is 8 years younger than [the plaintiff." Pl.'s SMF ¶ 26. Stajcar and the plaintiff received the same score on the occupational questionnaire used to generate the list of eligible candidates for the permanent CSI Director position based on the October 2008 vacancy notification, 99 out of 100 possible points. Goldfeder Decl. Ex. B at 16, ECF No. 44-3. Unlike the certificate of eligible candidates for the June 2008 vacancy, the list Owen received for the October vacancy did contain score information for each candidate. *See* Goldfeder Decl. Ex. F. at 35–37, ECF No. 44-3. Stajcar was at the top of this list and the plaintiff was listed fourth, with the second and third individuals listed also receiving a score of 99. *See id.* Of the list of thirteen eligible candidates for this position, three were members of ethnic minorities. *See* Pl.'s Ex. 29 at 2, ECF No. 53-12 FILED UNDER SEAL. The information provided to Owen did not include any reference to the candidates' ethnicity, age, or prior EEO activity. *See* Goldfeder Decl. Ex. F., at 35–37.

### 7. *Qualifications of the Selected Candidate*

Stajcar was appointed Director of CSI in January 2009. *See* Goldfeder Decl. Ex. X at 147, ECF No. 44-3. At the time Stajcar was appointed, he served in a GS-14 level position as the Director of the Washington D.C. Field Office (located in Herndon, Virginia) of C-TPAT. *See* Pl.'s Ex. 35 at 2, ECF No. 53-16. FILED UNDER SEAL. As noted, C-TPAT is another CCS program that covers "an end-to-end supply chain security." Owen Dep. at 189:20–21, ECF No. 44-6. Owen had been the Director of C-TPAT before he was placed in charge of all the CCS programs, Owen Supp. Decl. ¶ 6, and described the difference between C-TPAT and CSI as follows: C-TPAT "deals with the entire [supply chain security] process, where CSI deals with one limited node within that process. C-TPAT experience makes you more knowledgeable in the international cargo arena than a CSI position does." *Id.* at 189:21–190:3.

Prior to being placed in charge of the Washington C-TPAT office, Stajcar had served as a Supervisory Supply Chain Security Specialist, another GS-14 position, in Miami, Florida. Pl.'s Ex. 35 at 3, ECF No. 53-16 FILED UNDER SEAL. He had been promoted to that position after spending over three years as a GS-13 Supply Chain Specialist in the Miami CBP office. *Id.* at 4. Overall, Stajcar had been with CBP for over twelve years prior to his appointment as CSI director. *See id.* at 4–5. Prior to joining CBP, Stajcar had worked with the Department of Justice in Guantanamo Bay, Cuba as a mediator between Cuban migrants and the United States military. Deposition of Daniel Stajcar ("Stajcar Dep."), Pl.'s Opp'n Ex. 30 at 17:15–21, ECF No. 52-4. Both the plaintiff and Stajcar have bachelor's degrees. *See* Pl.'s Ex. 35 at 5 FILED UNDER SEAL; Pl.'s Dep. at 8:4–9, ECF No. 44-6.

While in Miami, Stajcar officially supervised sixteen employees, though he often acted as the responsible supervisor for the full complement of the office's staff, between thirty-two and thirty-three people. *See* Stajcar Dep. at 77:3–11, ECF No. 44-7. At other times during his tenure in Miami, Stajcar "directly supervised" "about 125 to 150 new employees . . . I was responsible for their training program and I was their supervisor for . . . an 18-month probation program." Stajcar Dep. at 35:14–19, ECF No. 52-4. In Herndon, Stajcar was directly responsible for approximately "two dozen" people. Owen Dep. at 217:21, ECF No. 53-3 FILED UNDER SEAL.

### 8.    *The Plaintiff's Instant Complaint*

The plaintiff contacted an EEO counselor regarding his failure to be promoted to permanent CSI Director two days after he learned he was not selected. SAC ¶ 10; Answer, ¶ 10 ECF No. 39. The plaintiff filed a formal EEO complaint on April 6, 2009 and requested a formal hearing before and EEOC Administrative Judge on October 15, 2009. *See* Answer, ¶ 10. The

defendant does not dispute that the plaintiff's request for a hearing was pending for over 180 days prior to filing suit, and he has, consequently, exhausted his administrative remedies, as required by Title VII and the ADEA. *See* 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407(b).

### B. Procedural History

The plaintiff filed the instant suit in February, 2010,[5] and subsequently amended his complaint twice, making the operative complaint the Second Amended Complaint, filed on August 1, 2011. *See* SAC, ECF No. 38. After thirteen months of discovery, the defendant moved for summary judgment. That motion, ECF No. 44, is now pending before the Court and for the reasons set forth below will be granted.

## II. LEGAL STANDARD

### A. Summary Judgment

Granting a motion for summary judgment is appropriate if the movant carries the burden of showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," based upon the pleadings, depositions, and affidavits, and other factual materials in the record. FED. R. CIV. P. 56(a), (c); *Ali v. Tolbert*, 636 F.3d 622, 628 (D.C. Cir. 2011); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). The Court is only required to consider the materials explicitly cited by the parties, but may, on its own accord, consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

When, at the summary judgment stage, the parties present a genuine dispute about the facts, the Court must draw all justifiable inferences in favor of the nonmoving party and accept the nonmoving party's evidence as true. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). For a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere

---

[5] The case was reassigned to the presiding Judge on January 20, 2011. *See* Docket Entry of January 20, 2011.

existence of a scintilla of evidence" in support of its position, *Anderson*, 477 U.S. at 252, "must

do more than simply show that there is some metaphysical doubt as to the material facts," *Scott*,

550 U.S. at 380, and cannot rely on "mere allegations" or conclusory statements, *see Veitch v.*

*England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir.

1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e).

Notably, "[s]elf-serving testimony does not create genuine issues of material fact, especially

where that very testimony suggests that corroborating evidence should be readily available."

*Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007).

Rather, the nonmoving party must present specific facts "'such that a reasonable jury

could return a verdict for the nonmoving party.'" *Grosdidier v. Broad. Bd. of Governors,*

*Chairman*, 709 F.3d 19, 23 (D.C. Cir. 2013) (quoting *Anderson*, 477 U.S. at 248); s*ee also* FED.

R. CIV. P. 56(c)(1). If the evidence "is merely colorable, or is not significantly probative,

summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Moreover, "[w]hen opposing parties tell two

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

could believe it, a court should not adopt that version of the facts for purposes of ruling on a

motion for summary judgment." *Scott*, 550 U.S. at 380.

"[A] complete failure of proof concerning an essential element of the nonmoving party's

case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In that situation,

summary judgment is properly granted against a party who, "after adequate time for discovery

and upon motion, . . . fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.*

at 322.

## B. National Origin/Race Discrimination

"Title VII of the Civil Rights Act, as amended, provides that all 'personnel actions affecting employees or applicants for employment' in Executive agencies 'shall be made free from any discrimination based on race.'" *Jackson v. Gonzales,* 496 F.3d 703, 706 (D.C. Cir.2007) (quoting 42 U.S.C. § 2000e–16(a)). "Under Title VII ... the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin ..." *Baloch v. Kempthorne,* 550 F.3d 1191, 1196 (D.C. Cir.2008). An adverse employment action generally entails a "tangible employment action evidenced by firing, failing to promote, a considerable change in benefits, or reassignment with significantly different responsibilities." *Stewart v. Ashcroft,* 352 F.3d 422, 426 (D.C. Cir. 2003). "Where, as here, the record contains no direct evidence that the adverse employment action of which the plaintiff complains was caused by prohibited discrimination, we turn to the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05 (1973), to analyze the claim." *Jackson,* 496 F.3d at 706 (quoting *Holcomb v. Powell,* 433 F.3d 889, 895 (D.C. Cir. 2006)). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* (internal quotation marks and alteration omitted). Where an employer has asserted legitimate, non-discriminatory reasons for the actions being challenged,

> the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas.* Rather, in considering an employer's motion for summary judgment ... the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Brady v. Office of Sergeant at Arms,* 520 F.3d 490, 494 (D.C. Cir. 2008)); *see also Hamilton v. Geithner,* 666 F.3d 1344, 1351–52 (D.C. Cir. 2012).

## C. Retaliation

The legal framework for demonstrating retaliation under Title VII is similar, but not identical, to the framework for establishing wrongful discrimination.  A *prima facie* case of retaliation requires a plaintiff to show that "(1) he engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action."  *Hamilton*, 666 F.3d at 1357 (quoting *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007)); *see also McGrath v. Clinton,* 666 F.3d 1377, 1380 (D.C. Cir. 2012) ("To prove unlawful retaliation, a plaintiff must show: (1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action 'because' the employee opposed the practice."); *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007); *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005); *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 650-51 (D.C. Cir. 2003); *Singletary v. District of Columbia*, 351 F.3d 519, 524 (D.C. Cir. 2003); *McKenna v. Weinberger*, 729 F.2d 783 (D.C. Cir. 1984).  With respect to the first element, protected activity encompasses utilizing informal grievance procedures, such as complaining to management or human resources about the discriminatory conduct, as well as the filing of both informal and formal EEO complaints.  *Richardson v. Gutierrez*, 477 F. Supp. 2d 22, 27 (D.D.C. 2007) ("It is well settled that Title VII protects informal, as well as formal, complaints of discrimination."); *Bell v. Gonzales,* 398 F. Supp. 2d 78, 94 (D.D.C. 2005) ("Initiation of EEO

counseling to explore whether an employee has a basis for alleging discrimination constitutes protected activity, even in the absence of an unequivocal allegation of discrimination.").

The second element of an adverse employment action is necessary to sustain a claim of retaliation, just as it is for discrimination claims. In the retaliation context, however, an employment action that is "materially adverse" is defined as one that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *Ginger v. District of Columbia*, 527 F.3d 1340, 1346 (D.C. Cir. 2008). Thus, retaliation "encompass[es] a broader sweep of actions" than wrongful discrimination, including "extend[ing] beyond workplace-related or employment-related retaliatory acts and harms." *Bridgeforth v. Jewell*, No. 12-5015, 2013 U.S. App. LEXIS 13467, *5 n.* (D.C. Cir. July 2, 2013) (internal quotation marks and citations omitted).

The *McDonnell Douglas* burden-shifting framework applies to retaliation claims such that "[w]here, as here, the employer has proffered a legitimate, non-retaliatory reason for a challenged employment action, the central question is whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was not the actual reason and that the employer intentionally retaliated against the employee in violation of Title VII." *McGrath*, 666 F.3d at 1383 (internal quotation marks, citation, and brackets omitted); *see also Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (observing that "these principles apply equally to retaliation claims").

## III.    DISCUSSION

The plaintiff is claiming national origin discrimination under Title VII, age discrimination under the ADEA, and retaliation for engaging in protected activities. *See* SAC ¶¶ 46–59. The Court addresses each claim seriatim, below.

### A.    The Plaintiff's Title VII National Origin Discrimination Claim

Based on the record evidence, the plaintiff has set forth a *prima facie* case: (1) he is a member of a racial minority (Hispanic), *see* Pl.'s Ex. 14, ECF No. 53-8 (DHS personnel records identifying the plaintiff as Hispanic) FILED UNDER SEAL[6]; (2) he applied for and was qualified for a position for which CBP was seeking applicants: namely, the CSI Director position, *see, e.g.*, Pl.'s Ex. 27, ECF No. 53-11 (list of eligible candidates for the CSI Director vacancy showing the plaintiff applied for and was certified qualified for the position) FILED UNDER SEAL, and he was not selected for the position, *see id.* (showing "not selected" notation next to plaintiff's name).

The burden now shifts to the defendant to "articulate legitimate, nondiscriminatory reasons for the challenged employment decision." *Aka v. Wash. Hospital Center*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). Here, the defendant has done so, citing Owen's perception that the plaintiff "failed to demonstrate the leadership skills and ability to respond to changing circumstances that Mr. Owen believed was needed for the position." Def.'s Mem. Supp. at 18.

Thus, the inquiry for the Court "distills to one question: 'Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the

---

[6] The parties spilled a significant amount of ink in addressing whether Owen knew the plaintiff was Hispanic at the time he made the decision not to promote him. The Court finds it unnecessary to resolve this dispute because, even assuming that the defendant did know the plaintiff's national origin, there is no evidence that the rationale for not promoting the plaintiff was pretextual. *See* III.A.1–7, *infra*.

employee on the basis of race . . . ?'" *Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013)

(quoting *Brady v. Ofc. of the Sgt. At Arms, U.S. House of Rep.*, 520 F.3d 490, 494 (D.C. Cir.

2007)). This question of whether the plaintiff has met his burden is to be considered in light of

"all the evidence in its full context." *Aka*, 156 F.3d at 1290. Specifically, the Court may

consider "(1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the

employer's proffered explanation for its actions; and (3) any further evidence of discrimination

that may be available to the plaintiff . . . or any contrary evidence that may be available to the

employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (quoting *Aka*, 156 F.3d

at 1291). The plaintiff presses seven arguments to discredit the defendant's explanation: (1) "an

absence of contemporaneous documentation supporting Defendant's explanation; (2)

inconsistencies and falsehoods in Defendant's explanations for its conduct; (3) [the plaintiff's}

superior qualifications; (4) Defendant's reliance on subjective criteria; (5) Defendant's deviation

from accepted selection practices and preselection of an unqualified candidate;" (6) "an absence

of contemporaneous documentation of purported concerns about [the plaintiff's] performance

issues," Pl.'s Opp'n at 11, and (7) "Owen's failure to ever permanently promote a minority." *Id.*

at 33. None of these arguments, considered alone or all together, is sufficient to defeat summary

judgment.

Before examining the plaintiff's arguments, it is important to view the actions of the

defendant, as the Circuit requires, in its entirety. *See Aka*, 156 F.3d at 1290. This is not a set of

circumstances, such as in *Hamilton*, where the plaintiff was never given a chance to demonstrate

his abilities. Indeed, in *Hamilton*, one of the factors pointing toward discriminatory intent was

the fact that the plaintiff was *not* given a "detail (for 12 months) into the position" but that the

detail, which was perceived to be advantageous, was given to the less qualified candidate. *See*

*Hamilton*, 666 F.3d at 1348. Moreover, here, the same supervisor accused of discriminatory motives, Owen, was the supervisor who appointed the plaintiff to be Acting Director in the position the plaintiff now claims was denied to him on the basis of wrongful discrimination. *See* Owen Dep. at 53:1–21, ECF No. 52-3.

The plaintiff has proffered evidence from before the critical period when he served as Acting Director. *See*, *e.g.*, Pl.'s Opp'n Exs. 9, ECF No. 52-3 (plaintiff's 2007 performance review); 12, ECF No. 52-3 (plaintiff's awards and other certificates throughout his entire CBP career); 13, ECF No. 52-3 (plaintiff's cash performance awards from his employment with CBP prior to his 2008). "While these indicators can be relevant to the question whether an employee is meeting legitimate expectations, they cannot 'demonstrate the adequacy of performance at the crucial time when the employment action is taken.'" *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009) (quoting *Fortier v. Ameritech Mobile Comm'ns, Inc.*, 161 F.3d 1106, 1112 (7th Cir. 1998)). Such "evidence showing that [he] had received favorable job reviews . . . during [earlier] years of [his] employment is not probative of [his] performance during the crucial . . . time period leading up to" the adverse employment action. *Fox v. Giaccia*, 424 F. Supp. 2d 1, 8 (D.D.C. 2006) (internal citations omitted).

In *Fox*, a discriminatory termination case brought under Title VII, much of the plaintiff's argument was based on the favorable reviews she had received during the first four years of her employment. *See id.* Yet, in the year leading up to the plaintiff's termination, the court credited the documented evidence of the plaintiff's most recent performance, which the plaintiff's supervisors found lacking. *See id.* at 8–9. In the instant case, the plaintiff's supervisors were given the opportunity to observe the plaintiff in an acting capacity for the very job to which he was applying. Another court in this Circuit has found such first-hand observation to be

particularly valuable to a decisionmaker. *See Gold v. Gensler*, 840 F. Supp. 2d 58, 67 (D.D.C. 2012) (crediting decisionmaker's testimony that plaintiff had less management skill than other candidate based on firsthand observation of plaintiff's management skill). Similarly, in *Jones v. Rivers*, a case the plaintiff relies upon, the court gave great weight to the fact that the plaintiff in that case "had served admirably in the [acting position] for twenty three months." 722 F. Supp. 771, 778 (D.D.C. 1989). The instant case is significantly different.

Finally, this Court is mindful of the Circuit's admonition that "courts must defer to the employer's decision as to which qualities required by the job (substantive versus managerial) it weighs more heavily." *Barnette v. Chertoff*, 453 F.3d 513, 517 (D.C. Cir. 2006) (citing *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003)). It is through this lens that the plaintiff's seven arguments must be viewed.

### 1. *Absence of Documentation Supporting the Defendant's Explanation*

The plaintiff's first argument challenges the defendant's assertion that the plaintiff "lacked 'leadership skills' and flexibility as inconsistent with [the defendant's] behavior contemporaneous to its failure to promote him." Pl.'s Opp'n at 11. The fundamental difference between the evaluations the plaintiff cites to and the critical period is that, previously, the plaintiff was in charge of a small piece of the CSI program at the GS-14 level, *see* Wiggins Dep. at 89:16–18, ECF No. 44-7 ("CSI needed some type of leadership and [the plaintiff] had a small branch"), while during the period in which he was not promoted he was acting in charge of the entire program at the GS-15 level.

Owen made his GS-"15 selections . . . based on leadership." Owen Dep. at 173:11, ECF No. 52-3. After Owen appointed the plaintiff to the acting CSI Director position in 2008, he noted myriad deficiencies in the plaintiff's performance. *See id.* at 73:14–22. Nevertheless, in

an acting role, Owen notes the plaintiff "had technical knowledge of the program," "maintained a high level of overseas inspections, [and] operated within budget." *Id.* at 72:20; 73:7–8. This is consistent with the plaintiff's former supervisor, Wiggins', assessment of his skills. *See* Wiggins Dep. at 91:6–8, ECF No. 44-7 ("As far as leadership, I don't know if I would have made that recommendation at the time that I put him in as acting or recommended him as acting."). There is no dispute that the plaintiff was technically capable of managing the CSI program. *See id.* at 91:4–5 ("As far as having the technical expertise to manage the CSI program, he – [the plaintiff] had it."). There is, however, "a big difference between a 14 and a 15." *Id.* at 91:3–4.

The mere fact that the plaintiff was not removed from his Acting Director position is not an indication that he was qualified for the permanent Director position. Owen notes that the plaintiff "managed the program competently" but that "is not the same thing as demonstrating the leadership ability to permanently run the program." Owen Supp. Decl. ¶ 24. At the time Owen was making his decision about whom to recommend for the permanent Director position, "the future presented numerous challenges, including meeting Congressional mandates regarding expansion of CBP programs but with shrinking budgets and expanding cross-utilization of assets within CBP to accomplish those mandates. The leadership skills of building relationships within organizations, thinking long-term strategy for CBP, and cross-utilizing CBP's resources to get the mission accomplished was critical to the position." *Id.* ¶ 19. It was in these exact areas that Owen believed the plaintiff to be deficient. *See*, *e.g.*, Owen Dep. at 73:20–22, ECF No. 52-3 ("I felt there was a failure to recognize changing environments and to adapt for those environments").

Furthermore, the fact that the plaintiff was given a cash award while an Acting Director is, if anything, indicative of Owen's critical evaluation of the plaintiff's performance. While

Owen gave the plaintiff a $2,000 award, he "approved awards of $4,000 for the Directors of SFI, NTC-C, C-TPAT, and Cargo Control."  Owen Decl. ¶ 24.  The fact that the plaintiff was awarded only half the bonus given to his peers corroborates the view Owen articulated about deficiencies in the plaintiff's performance after observing him for nearly a year.

Similarly, the fact that Owen recommended the plaintiff for a GS-14 position as the El Paso Border Security Coordinator is not, as the plaintiff argues, inconsistent with Owen's concerns about the plaintiff operating as a GS-15 at headquarters.  Notably, the plaintiff's supervisor in El Paso recalls Owen stating that the plaintiff "was a very competent manager and that for the border security position that I was looking to fill, that [the plaintiff] would be an excellent candidate."  Hinojosa Dep., ECF No. 52-4, at 46:4–8.  Owen's evaluation of the plaintiff's skills to Hinojosa was "specific[] . . . with regards to what I was looking for in the border security coordinator position."  *Id.* at 49:12–14.  Despite the plaintiff's assertion, Owen's recommendation for a non-headquarters, GS-14 position is not inconsistent with Owen's stated reasons for not promoting the plaintiff to a GS-15 headquarters position.  Set against the record evidence as a whole, the Court finds unpersuasive the plaintiff's argument that the defendant exhibited contemporaneous behavior inconsistent with its complaints about the plaintiff's leadership abilities.

### 2.  *Inconsistent Explanations*

The plaintiff's next argument is that the reason he was given for his non-promotion was different than the reason the defendant asserts now.  *See* Pl.'s Opp'n at 14.  This argument boils down to two conversations between Owen and the plaintiff, one in August of 2008 and one in October of 2008, where the plaintiff asserts that Owen told him Winkowski was responsible for making the ultimate decision.  *See* Pl.'s Opp'n at 14 ("Owen responded that [the plaintiff] was

doing an excellent job and he was happy with his work but claimed the decision was 'out of [his] hands' because Assistant Commissioner Winkowski wanted someone who had not been with the CSI program since its inception.") (alteration in the original). Owen's account varies slightly, but on summary judgment the Court grants the plaintiff all reasonable inferences. *See Hamilton*, 666 F.3d at 1351.

First, assuming the plaintiff's version of this conversation is correct, Owen's statement is literally true: Owen was the recommending official and Winkowski was the selection official. *See* Owen Dep. at 126:1–5, ECF No. 52-3. Thus, the ultimate decision was up to Winkowski, not Owen. *Id.* Second, a statement by Owen that he was "happy with [the plaintiff's] work" is different from a statement that he believed the plaintiff was qualified to take on the position permanently. *See* Owen Decl. ¶ 24 ("Managing the program competently from a technical standpoint, however, is not the same thing as demonstrating leadership ability to permanently run the program."). Finally, the mere fact that Owen was tactful in not stating bluntly that the plaintiff did not have sufficient leadership skills for a GS-15 position is not, in and of itself, evidence of pretext as the cases cited by the plaintiff make plain.

For example, the plaintiff relies upon *Geleta v. Gray*, 645 F.3d 408, 413–14 (D.C. Cir. 2011). There, the D.C. Circuit found an employer's initial instruction to an employee to "make up a reason" for "why [the plaintiff] needed to find a new position" did not match with the employer's position during litigation that the plaintiff was terminated in order to allow the employer to maintain federal funding. *Id.* In that case, the Court found it probative that the employer's actions did not even match with its purported rationale advanced at litigation. *See id.* at 414 ("If the District's true purpose for 'realigning' DC CINGS was to ensure the program's continued funding, it seems strange that the Department eliminated the program so soon

thereafter.").  In the instant case, the defendant told the plaintiff a candidate who had not been

with the CSI program since its inception would be preferred and, indeed, the defendant selected a

candidate, Stajcar, from outside the program with experience in other areas.  Thus, there is no

factual disconnect between the reason offered the plaintiff, the reason the defendant offers now,

and the actions the defendant took at the time, as there was in *Geleta*.

The plaintiff also relies on *Colbert v. Tapella*, 649 F.3d 756 (D.C. Cir. 2011), but this

reliance is similarly misplaced.  In that case, the Court saw considerable probative value in the

fact that the defendant's explanation for the adverse employment decision was directly and

admittedly contradicted during litigation.  *See id.* (noting the employer "said he did not select

[the plaintiff], in part, because she 'wandered.' When later asked whether he actually believe [the

plaintiff] wandered, [the employer] said 'not really.'").  That is not the situation in the instant

case.  Here, Owen maintains he did tell the defendant that experience from other programs was

useful, Owen Dep. at 177:18–22, ECF No. 52-3, a position he still maintains, and that he acted

upon in hiring a candidate from outside CSI.

Thus, the plaintiff has not shown that Owen's explanation, even assuming the

conversation occurred exactly as the plaintiff remembers it, was actually false or that the reason

given was not taken into consideration by Owen in making the ultimate decision.  Even if the

plaintiff had done so, "[a] plaintiff cannot always avoid summary judgment by showing the

employer's explanation to be false . . . ."  *Colbert*, 649 F.3d at 759 (quoting *Aka*, 156 F.3d at

1292).  "An employer would be entitled to judgment as a matter of law if the record conclusively

revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff

created only a weak issue of fact as to whether the employer's reason was untrue and there was

abundant and uncontroverted independent evidence that no discrimination had occurred."  *Id.*

(quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).  Here, the plaintiff has not even created an "issue of fact," let alone a "weak" one, as to whether the employer's explanation was false.  Therefore, the plaintiff's second argument is insufficient to support denial of summary judgment.

### 3.  *Comparative Credentials*

The plaintiff's third argument compares the plaintiff's credentials to those of the candidate eventually selected and asserts "[a] reasonable juror could easily conclude that [the plaintiff] was more qualified and, in combination with other evidence of pretext, find Defendant's purported reasons for non-selection 'unworthy of credence.'"  Pl.'s Opp'n at 16.  The plaintiff's assertions are unpersuasive.

In *Hamilton*, the court noted that there is essentially a direct relationship between the gap in qualifications between two candidates and its probity of pretext.  *See Hamilton*, 666 F.3d at 1352.  Generally, "employers do not usually" select "a less-qualified candidate . . . unless some other strong consideration, such as discrimination, enters the picture."  *Id.*  If the gap in qualifications is significantly great it can "standing alone . . . support inference of discrimination."  *Id.*  Thus, the wider the gap in qualifications between the plaintiff and the selected candidate, the greater the likelihood of pretext in the employer's explanation.  The facts in *Hamilton* are instructive on this point.

The *Hamilton* Court highlighted that the plaintiff in that case had "far more formal training and education," "significantly greater technical expertise," "and broader experience developing and managing complex safety programs," a requirement for the job at issue.  *Id.* at 1352.  In *Hamilton*, the plaintiff applied for a safety manager position with the IRS and scored the same on his KSA questionnaire, which is "a preliminary assessment designed to identify

candidates worthy of further consideration," as the selected candidate. *Id.* at 1355. The plaintiff had a bachelor's degree in industrial hygiene, was certified by the American Board of Industrial Hygiene, and had a "master's level Senior Executive Leadership Training program for the federal government sector." *Id.* at 1353. In comparison, the selected candidate had no college degree and one forty-hour OSHA class to her credit. *Id.* The plaintiff had broad and varied experience that left "him well-positioned to perform the extremely complex and significant functions in the development of [safety] decisions and policies." *Id.* (alteration in original and citation omitted).

Even this wide disparity in education and experience, which the *Hamilton* Court found was unmitigated by the identical KSA scores, still left a "relatively close question" and required additional evidence to prove an inference of discrimination. *Id.* at 1352. In the instant case, the plaintiff's qualifications compared to Stajcar's qualifications do not present nearly so stark a comparison, making it clear that "a reasonable juror who might disagree with the employer's decision, but would find the question close, would not . . . infer discrimination on the basis of a comparison of qualifications alone." *Id.* (quoting *Aka*, 156 F.3d at 1294).

The plaintiff also relies on *Lathram v. Snow*, 336 F.3d 1085 (D.C. Cir. 2003), but that case makes clear how wide the gulf must be between the experiences of the candidate selected and the candidate passed over to infer discrimination. In *Lathram*, the candidate hired "had no experience" in the area for which he was hired at all, and was, at the time he was hired, "an unemployed former editor and writer of a trade publication. In contrast, Plaintiff had significant experience in drug interdiction work and had served as Deputy Spokesman for the United States State Department's Bureau of African Affairs." *Id.* at 1091. The Court in *Lathram* found that the reassignment of the plaintiff's duties to the other candidate "may give rise to an inference of

discrimination." *Id.* *Lathram*, like *Hamilton*, stands for the proposition that vast differences between candidates are necessary to infer discrimination based on comparative qualifications.

Here, both the plaintiff and Stajcar had the same level of education, a bachelor's degree. *See* Pl.'s Ex. 35 at 5 FILED UNDER SEAL; Pl.'s Dep. at 8:4–9, ECF No. 44-6. The two were at the same GS level 14, though Stajcar's permanent position as Director of the Washington, DC C-TPAT field office had "much more [responsibility] than . . . a branch chief at CSI," the plaintiff's last permanent position. Stajcar Dep., at 87:8–10, ECF No. 52-4. Stajcar had experience supervising over 100 employees, *see id.* at 35:14–19, and experience briefing "foreign government officials, U.S. embassy officials, ambassadors, DCMs, consul generals as far as what C-TPAT" was doing. *Id.* at 44:10–17. Stajcar was quickly promoted through the ranks, achieving the same level as the plaintiff in less time. *See* Pl.'s Opp'n at 22 (noting Stajcar, reached the GS-14 level with twelve years of experience while it took the plaintiff twenty years). In short, the relative qualifications between the plaintiff and the selected candidate are, at least, comparable.[7]

The plaintiff's other arguments on this score similarly miss the mark. For instance, the plaintiff argues that "Owen himself admitted that previous experience in a program is a relevant factor in determining whether a candidate is qualified for a position," Pl.'s Opp'n at 18, and stressed that "the plaintiff . . . had *extensive* experience in the CSI program."[8] Yet the plaintiff concedes that Owen also told the plaintiff that experience from outside CSI was something for which the assistant director was looking. Pl.'s Opp'n at 14. An employer is entitled to look at

---

[7] Arguably, Stajcar's management and breadth of experience could be viewed as more significant than the plaintiff's.
[8] It is important to recognize that while the plaintiff did join CSI in 2004, the program was a post 9/11 creation that was not even fully operational when the plaintiff joined. *See* Ahern Dep. at 91:10–92:14, ECF No. 44-6 (describing genesis of CSI program as beginning in 2003 and "kind of a maintenance" after three or four years). Thus, while it is true that, when he was promoted to Acting Director, the plaintiff had more than three years of experience in CSI, since the program only began recently, it is fair to say that few people had an opportunity for "extensive" experience with the program.

the extent of experience in a particular position as well as for the breadth of experience a position may call for.

The plaintiff also cites repeatedly the plaintiff's perfect evaluations before becoming Acting Director.[9] As noted, however, these evaluations are not nearly as probative of the plaintiff's skills for the CSI Director position as those observed while he was Acting Director. The plaintiff recognizes the importance of his performance in the Acting Director position, stating "[p]erhaps the most obvious evidence of [the plaintiff's] qualifications is the fact that [the plaintiff] had been successfully acting in the GS-15 CSI Director position." Pl.'s Opp'n at 17. Unfortunately, the plaintiff's performance as Acting Director was not as "successful" as he perceived it to be.

The plaintiff's reliance on *Jones v. Rivers*, 722 F. Supp. 771 (D.D.C. 1989), for the proposition that the plaintiff's work as Acting Director should be dispositive of him being the better candidate is misplaced since *Jones* cuts the other way.[10] In *Jones*, the court focused on the fact that "for twenty three months, plaintiff performed her job with distinction." *Id.* at 776. The *Jones* court went on to list the plaintiff's substantial achievements and program enhancements she instituted *while in the Acting role*, which served to improve her agency and garner letters of commendation for her work. *Id.* Here, by contrast, the plaintiff's direct supervisor notes that the plaintiff did no more than "maintain[] a high level of overseas inspections, operated within

---

[9] The record does not indicate that Owen created a formal performance appraisal for the plaintiff during his time as Acting Director.

[10] The plaintiff also relies on *Caudle v. District of Columbia*, 804 F. Supp. 2d 32 (D.D.C. 2011), which was reversed and remanded on appeal, for the proposition that Stajcar's less than perfect performance reviews prior to his selection for the CSI Director position shows pretext. *See id.* at 48–49. In *Caudle*, the employees were fired for performance reasons by the same supervisors who gave them excellent reviews based on their performance *in the job* at issue. *See Caudle*, 804 F. Supp. 2d at 48. Here, the excellent performance reviews the plaintiff received were prior to his service as Acting Director. *See* Pl.'s Opp'n at 20. Indeed, one of the plaintiffs in *Caudle* had been named his unit's Officer of the Year shortly before he was fired and the purported performance deficiencies raised by the defendant were not credible. *See Caudle*, 804 F. Supp. 2d at 48, 48 n.16. That is not the case here. Finally, plaintiff raises concerns about Stajcar's performance in the Director position after he was appointed. Pl.'s Opp'n at 24. This performance is irrelevant because it had not yet occurred at the time of his selection, unlike the assessment of the defendant's performance in the Acting Director position.

budget," Owen Dep. at 73:7–8, ECF No. 44-6, and the only "commendation" the plaintiff received while in the Acting Director position was the cash award that was only half that given to his peers.[11]

The plaintiff finally tries to emphasize the differences between C-TPAT and CSI in order to show that the selected candidate's experience was deficient when compared to the plaintiff's, *see* Pl.'s Opp'n at 19–20, but this effort is unavailing. C-TPAT and CSI were both "the cornerstone of Customs and Border Protection when you look at the cargo, the international cargo side." Winkowski Dep. at 42:7–9, ECF No. 44-6. Both initiatives dealt with "securing the supply chain of international cargo," with C-TPAT being a very large, international public-private partnership dealing with supply chains from end-to-end and CSI being a smaller, more focused initiative designed to "push[] the borders out . . . to do cargo exams so cargo that presented a risk to [the United States] could be inspected" overseas. *Id.* at 42:12–43:1. The two programs did, as the plaintiff points out "have entirely distinct functions," Pl.'s Opp'n at 19–20, but the programs both dealt with international cargo and supply chain security, were under the same CCS division of CBP, and were "inextricably linked as part of a risk reduction of a later enforcement strategy." Ahern Dep. at 92:16–17, ECF No. 44-6. In fact, one of the reasons Stajcar was selected was because CBP was "melding . . . CSI and C-TPAT," and beginning the process of integrating the two programs. Winkowski Dep. at 43:21–44:2, ECF No. 44-6.

The instant case does not present the level of evidence present in *Hamilton* that one candidate was markedly more qualified than the other. Nor is it a situation, as in *Aka*, where the candidate selected had "two months of part-time volunteer work" while the candidate passed over had nineteen years of professional experience. *Aka*, 156 F.3d at 1296. Rather, Stajcar and

---

[11] The plaintiff consistently points to the number of cash awards and commendations he received over the course of his career but cannot point to a single commendation or award he received while Acting Director aside from the aforementioned cash award.

34

the plaintiff were each experienced, veteran CBP employees working at the same GS level with the same level of education in the same umbrella organization at CBP in two programs that were "inextricably linked." "[P]ointing to differences in qualifications that merely indicate a 'close call' does not get [the plaintiff] beyond summary judgment." *Stewart*, 352 F.3d at 430.

As the court noted in *Aka*, "[a]n employer may of course select a candidate who on paper is less qualified for other reasons, such as subjective reactions that emerge in the interview." *Aka*, 156 F.3d at 1294 n.10. Here, the defendant makes clear that, even if Stajcar were arguably less qualified on paper, Owen made his decision based on his observations of the defendant while in the Acting role, where the plaintiff had "difficulty in resolving conflict across organizational lines," failed to "recognize changing environments and to adapt for those environments" and had "a black-and-white view towards much of the program, a rather parochial view as opposed to a higher level strategic CBP view." *Compare* Owen Dep. at 73:14–74:4, ECF No. 44-6, *with* Goldfeder Decl. Ex. A at 6, ECF No. 44-3, (describing the demands of the CSI Director position).

The Court finds that a reasonable juror may be able to disagree with the decision made by the employer, but would certainly "find the question [of comparative qualifications] close" and would "assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." *Barnette*, 453 F.3d at 518. Therefore, the Court does not find that the plaintiff was "significantly more qualified" than Stajcar such that Stajcar's hiring is indicative of discriminatory pretext.

### 4. *Reliance On Subjective Criteria*

The plaintiff is correct that "subjective considerations" are traditionally viewed with skepticism when used to support an adverse employment decision. *See, e.g.*, *Aka,* 156 F.3d at 1298. Yet, the purportedly subjective considerations at issue here are dissimilar to those cautioned against in this Circuit's precedent.

For instance, in *Hamilton*, the subjective consideration at issue was the fact that the successful candidate "outperformed" the plaintiff in an interview for the position. *Hamilton*, 666 F.3d at 1355. Nevertheless, the "communication skills" the employer cited as one of the primary reasons for the selection decision were not emphasized in the job description and "the record contain[ed] only vague descriptions of [the plaintiff's] interview performance." *Id.* at 1356. In the instant case, the job description includes extensive requirements for strong interpersonal skills and strategic thinking, *see* Goldfeder Decl. Ex. A at 5, ECF No. 44-3, and the plaintiff's deficiencies in this area were documented over the entire period the plaintiff served as Acting Director. *See* Def.'s Reply at 3

In *Aka*, the subjective consideration at issue was whether the plaintiff showed sufficient "enthusiasm" in his interview. *Aka*, 156 F.3d at 1298. Notably, the Court in *Aka* was careful to explain that "employers may take subjective considerations into account in their employment decisions." *Id.* Indeed, in cases where courts rely on the subjectivity of the criteria at issue, the deciding factor on summary judgment is often that "a jury could reasonably find that the plaintiff was otherwise significantly better qualified than the successful applicant." *See id.*; *see also Hamilton*, 666 F.3d at 1357 ("[T]he jury might also conclude that [the plaintiff] was not significantly more qualified than [the selected candidate] and that [the selected candidate's] interview performance legitimately tipped a difficult choice in [the selected candidate's] favor.").

It is in these close cases, where the plaintiff's qualifications were significantly better than the selected candidate's, that the subjectivity of considerations lends itself to the inference of pretext.

This case is quite different. As explained above, the plaintiff was not "significantly more qualified" than the candidate who was selected. Neither were the "subjective" elements of the CSI Director position unknown or unimportant to the position—they were explicitly noted in the job description. Additionally, this is not a situation, as in *Hamilton*, where essentially no evidence was adduced that the plaintiff did not perform well in the interview (the subjective consideration at issue). *See* 666 F.3d at 1356-57. In this case, by contrast, to the extent that the plaintiff's service in the Acting Director position amounted to a nearly year-long interview, specific deficiencies were documented. "While it is true that subjective criteria lend themselves to racially discriminatory abuse more readily than do objective criteria, there nonetheless are situations where employment decisions can, must, and should be made on the basis of subjective criteria." *Harris v. Group Health Ass'n*, 662 F.2d 869, 873 (D.C. Cir. 1981). The instant case is one of those situations and the mere fact that the defendant used a subjective consideration about leadership skills, in which the plaintiff was found deficient in at least eight documented instances, is not conclusive or even persuasive evidence of discrimination.

### 5.    *Deviation From Accepted Selection Practices*

The plaintiff argues that Owen's "selection process for the CSI Director position was minimal and rejected a number of safeguards commonly employed by his peers." Pl.'s Opp'n at 27. As a threshold matter, the plaintiff has not identified which precise "regulations or procedures" were not followed. *See Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982) (noting failure to follow standardized agency hiring "regulations or procedures" could indicate discriminatory pretext). Nor is there any indication that Owen improperly "deviat[ed] from the

collective bargaining and merit protection plan," which was a key issue in *Allen v. Perry*, 279 F. Supp. 2d 36, 43–44 (D.D.C. 2003), which is cited by the plaintiff, because Owen was hiring for a senior management position for which different criteria were operative. Even if standard procedures were not followed, the case law makes clear that such failure to follow "alone, may not be sufficient to support a finding" of discrimination. *Johnson*, 679 F.2d at 922. Here, the plaintiff fails to specify any "regulations or procedures" the defendant failed to follow but merely makes the conclusory observation that some of Owen's peers followed different procedures.

Wiggins' deposition is instructive on this point. As someone who has "had the opportunity to be involved with observe or be involved with the selections for GS-15 positions" and "all grades," Wiggins is in an authoritative position to explain CBP's hiring processes.[12] *See* Wiggins Dep. at 141:12–15, ECF No. 55-2. Wiggins described the hiring process used as varying, "depend[ing] on the organization," and depending upon "a lot of pending factors." *Id.* at 141:21–22. She further detailed these factors as follows:

> Generally, the process is a certificate of eligibles is referred to a selecting official. He or she can determine if they want to interview everybody on the list or select few [sic] on the list. They can determine whether or not they want to conduct reference checks, and they can also determine whether or not they want a panel interview versus a tier interview . . . [a]ll of those are processes that are acceptable. None of it is mandated.

*Id.* at 142:3–142:13. In fact, when asked whether there was a "uniform policy within CBP about how the decision making has to occur," Wiggins answered "Not that I'm aware of . . . [t]here's no policy." *Id.* at 142:17–143:1.

To make the plaintiff's argument colorable, the practice must be "so irregular or inconsistent with [the agency's] established policies as to make its hiring explanation

---

[12] Notably, the plaintiff has provided no evidence from any human resources professional at CBP to discuss the "standard" selection practices.

unworthy of belief." *Porter v. Shah*, 606 F.3d 809, 816 (D.C. Cir. 2010) (quoting *Simms v. Okla. ex rel Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999)). There is no evidence here that there was any uniform policy at all, let alone that it was departed from in such an "irregular or inconsistent" way as to "make [the agency's] hiring explanation unworthy of belief." *Id.*

To bolster his argument about unfairness in the selection process, the plaintiff argues that Stajcar was pre-selected. Pl.'s Opp'n at 28. This argument is not supported by the record evidence, nor legally sufficient. First, the email cited by the plaintiff as evidence that Owen "encouraged [Stajcar] to apply for the [CSI Director] position," *see* Pl.'s Opp'n at 28, shows that Stajcar reached out to Owen to ask several questions, including whether Owen thought Stajcar should apply, and whether Stajcar had "been in [his] current position long enough . . . or would [Owen] prefer [he] stay in this position longer?" Pl.'s Opp'n Ex. 32, ECF No. 52-4, at 179. Owen answered that he felt Stajcar was qualified for the job, that the CSI position would "suit" him and that Stajcar did have "one year managing major components of a program," one of the questions Stajcar had to answer in his application. *Id.* Nevertheless, Owen asked Stajcar when he became a GS-14, presumably as a precursor to answering the question as to whether Stajcar had the requisite time to qualify for the position. *See id.* at 178. Stajcar replied with his date of becoming a GS-14 and said "I think I will go ahead and apply and see what happens. I guess I have nothing to lose." Owen did not, as the plaintiff's brief asserts, tell Stajcar to apply anyway. Pl.'s Opp'n at 28. Eventually, it was determined that Stajcar did not meet the requirement for "time in grade." *See* Pl.'s Ex. 33 at 2, ECF No. 53-14 FILED

UNDER SEAL.  Notably, Owen did not tell Stajcar he had the requisite time in grade.  *See* Pl.'s Opp'n Ex. 32 at 179, ECF No. 52-4.

In any event, even if the plaintiff is correct and Stajcar was pre-selected, "courts have not found even an express pre-selection to necessarily be suggestive of discrimination."  *Bailey v. Wash. Metro. Area Transit Auth.*, 810 F. Supp. 2d 295, 307 (D.D.C. 2011); *see also Tolson v. James*, 315 F. Supp. 2d 110, 118 (D.D.C. 2004) ("Pre-selection does not violate Title VII unless it is based on discriminatory motives").  Plaintiff has not shown any evidence that Stajcar's selection was based on a discriminatory motive against the plaintiff, thus making whether Stajcar was pre-selected irrelevant to the issue at hand.  The Court finds the argument that Owen failed to follow internal procedures and pre-selected a candidate unavailing.

### 6.      *Lack Of Contemporaneous Evidence Of Legitimate Performance Issues*

The plaintiff next argues that there is an "absence of a contemporaneous record documenting [the] employer's asserted explanation" for not promoting the plaintiff.  Pl.'s Opp'n at 29.  Again, the plaintiff misconstrues the law of this Circuit and ignores the substantial documentary evidence presented by the defendant.

The plaintiff relies upon the Court's rationale in *Hamilton*, which cited as possible proof of pretext that "the record contains no contemporaneous documentation of the [agency's] proffered explanation—that [one candidate] outperformed [the plaintiff] in the interview" for the position.  666 F.3d at 1355.  The Court in *Hamilton* went on to note that the "contemporaneous documentation" to which it was referring was the fact that "neither selecting official Burns nor the other panelists appear to have created any written evidence of their deliberations or their reasons for choosing" the successful candidate.  *Id.* at 1355-56.  That situation is the opposite of

the instant case where there is a wealth of evidence indicating Owen made the plaintiff aware of his deficiencies in e-mails. *See* Goldfeder Decl. Ex. I at 84, ECF No. 44-3; Ex. J at 87, ECF No. 44-3; Ex. K at 89–90, ECF No. 44-3; Ex. M at 95–99, ECF No. 44-3; Ex. N at 101, ECF No. 44-3; Ex. O at 103, ECF No. 44-3; Ex. P. at 107, No. 44-3; and Ex. U at 137, No. 44-3. The fact that the plaintiff views the observations or conclusions reflected in the emails as "minor," Pl.'s Opp'n at 29, is irrelevant. *See Vatel v. Alliance of Auto Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) ("It is settled that 'it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'") (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)).

Furthermore, the plaintiff's reliance on statements from people other than Owen as to their working relationship with the plaintiff is also irrelevant. The relevant perception and belief in this case is the employer's (or, more specifically, Owen's) not the plaintiff's former supervisors or peers. *See George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."); *Brady*, 520 F.3d at 496 (granting summary judgment where plaintiff did not "produce evidence sufficient to show that the [employer's] conclusion was dishonest or unreasonable."). Owen has made it clear that he felt the plaintiff was technically proficient in running the program, but had serious reservations about his ability to direct CSI permanently in light of changing circumstances. *See, e.g.*, Owen Supp. Decl. ¶¶ 19, 21. The plaintiff has produced no evidence "sufficient to show that [Owen's] conclusion was dishonest or unreasonable." *See Brady*, 520 F.3d at 496.

In the face of ample contemporaneous evidence of Owen's perception of the plaintiff's deficiencies, the plaintiff's argument otherwise is unpersuasive.

### 7. *Owen's Failure To Promote Other Minority Candidates*

Finally, the plaintiff asserts that a jury could infer discrimination based on Owen's failure to promote other Hispanics. Pl.'s Opp'n at 34. This argument is substantially undercut from the beginning by the fact that Owen initially promoted the plaintiff to Acting Director. *See Vatel*, 627 F.3d at 1247 ("[The plaintiff's] argument faces a significant initial hurdle in that [the employer] himself selected [the plaintiff] to be his assistant less than a year before her dismissal"). "[W]hen the person who made the [adverse employment decision] was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire." *Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)).[13]

The strength of the plaintiff's argument is further undercut by the fact that, shortly after Owen made the decision not to promote the plaintiff, he promoted another Hispanic manager, Frank Jaramillo, to Acting Executive Director of CCS, Owen's own position, when Owen was appointed Acting Deputy Assistant Commissioner. Owen Supp. Decl. ¶ 17. "[A]n employer's favorable treatment of other members of a protected class can create an inference that the employer lacks discriminatory intent." *Elion v. Jackson*, 544 F. Supp. 2d 1, 8 (D.D.C. 2008) (quoting *Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 524 (3d Cir. 2003)). It is also

---

[13] The plaintiff inexplicably cites *Czekalski v. Peters*, 475 F.3d 360 (D.C. Cir. 2007), in an attempt to support his argument that an "acting" position is substantially different from a permanent one such that Owen's promotion of another member of the plaintiff's protected class to an acting position, in addition to the promotion of the plaintiff himself, is not viable evidence of a lack of discriminatory animus. *See* Pl.'s Opp'n at 34–35 n.20. First, *Czelaski* involved a permanent transfer from a permanent position; the question of whether an acting position is equivalent to a permanent position was never raised. *See id.* at 362. Second, while the *Czelaski* court noted that a supervisor is not insulated from a charge of discriminatory animus merely because the same supervisor originally appointed the plaintiff to her position, it did so in light of substantial evidence from other employees who had observed that supervisor acting in a discriminatory and sexist fashion on numerous occasions. *Id.* at 368-69. In the instant case, the plaintiff has failed to produce any evidence of Owen ever acting in a discriminatory manner toward Hispanics, and his argument that Owen created some sort of "glass ceiling" for Hispanics is conclusory and unsupported by the record.

impossible to determine from the evidence put forth by the plaintiff whether Owen had the opportunity to promote other Hispanics, a fact called into question by the selection registers for this position, which indicated the plaintiff was the *only* Hispanic on the certificates of eligible candidates. *See* Pl.'s Ex. 29 at 2, ECF No. 53-12 (detailing the racial composition of all eligible candidates for the June and October 2008 vacancies) FILED UNDER SEAL. Therefore, the plaintiff's argument about Owen's practice regarding other positions is a red herring.

*     *     *

The plaintiff had an opportunity to demonstrate his leadership ability as Acting Director of CSI for almost a full year. In that time, he demonstrated leadership deficiencies multiple times, such that the defendant reasonably believed that the plaintiff would be unable to adequately perform as the permanent CSI Director. Instead of promoting the plaintiff, the defendant promoted one of the plaintiff's GS level peers, Stajcar, who, in the defendant's view, had demonstrated the requisite leadership qualities. On paper, both the plaintiff and Stajcar were strong candidates and the defendant made a business decision to select Stajcar based on his observations. In the absence of *any* evidence of racial animus from Owen, and in light of all of the plaintiff's arguments as to why the defendant's logical, non-discriminatory reasons for failing to promote the plaintiff were pretextual, the Court grants summary judgment to the defendant on the Title VII claim.

### B. ADEA and Retaliation Claims

The plaintiff's remaining claims for age discrimination and for retaliation stem from the same adverse employment decision, namely, the failure to promote the plaintiff to the position of CSI Director. *See* SAC ¶¶ 47, 56 ("Defendant discriminated against [the plaintiff] by failing to promote him to the position of Director/Program Manager of CSI . . . ."). As previously noted,

the inquiry for the Court "distills to one question: 'Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . ?'" *Evans*, 716 F.3d at 620 (D.C. Cir. 2013) (quoting *Brady*, 520 F.3d at 494).[14] The plaintiff has failed to provide sufficient evidence of pretext and, therefore, his claims for age discrimination and retaliation must also fail for the same reasons outlined in Part III.A, above. The ADEA inquiry is substantially identical to the Title VII inquiry in that both follow the *McDonnell Douglas* framework, thus the rationale for rejecting the plaintiff's Title VII claim apply equally to his ADEA claim. *See, e.g.*, *Chowdhury v. Schafer*, 587 F. Supp. 2d 257, 264 n.3 (D.D.C. 2003) (collecting cases).

Notably, on the retaliation claim, the Court is skeptical that the plaintiff has even made out a *prima facie* claim of retaliation necessitating a showing of non-discriminatory reasons from the defendant. In order to prove a *prima facie* case of discriminatory retaliation, the plaintiff must show "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Jones v. Bernake*, 557 F.3d 670, 677 (D.C. Cir. 2009) (citing *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). Assuming, *arguendo*, that the first two prongs of the test are met, the third prong is fatal to the plaintiff's retaliation claim.

The plaintiff bases his retaliation claim on EEO complaints he made in 1994 and between 1997 and 2001. Pl.'s Opp'n at 39. The plaintiff asserts that he was labeled a "troublemaker" as a result of his EEO activity, yet he produces no evidence to support that conclusion. *See* Pl.'s SMF ¶ 70. As the D.C. Circuit has made clear, retaliation claims are "undermined" when the

---

[14] The *Brady* inquiry is equally applicable to ADEA cases as to discrimination cases based on national origin or race. *Chowdhury v. Schafer*, 587 F. Supp. 2d 257, 264 n.3 (D.D.C. 2008) (collecting cases).

person against whom the discriminatory complaint was made (in this instance, Winwood) is not the person who was responsible for the adverse employment action (here, Owen). *See Vickers v. Powell*, 493 F.3d 186, 196 (D.C. Cir. 2007).[15] Here, there is no dispute that Owen was not the target of any of the plaintiff's prior EEO complaints and, indeed, the plaintiff admits that Owen only learned of the plaintiff's prior EEO activity after Owen decided against promoting the plaintiff in June, 2008. Pl.'s Dep. at 119:8–25, ECF No. 44-6. The person who was the target of the plaintiff's 1994 action retired from CBP in 2002, although the plaintiff alleges the target was still "in the [CBP] building" engaged in consulting work. Pl.'s SMF ¶ 74. The plaintiff strains to pull Winwood into this case somehow, asserting that Winwood had "access to the entire organization" as a contractor, even though he retired from the CBP five years before the events at issue in the instant case. *See* Pl.'s Opp'n at 16. Needless to say, mere "access" is not a substitute for clear evidence of untoward influence by Winwood, particularly in light of the defense witnesses' unqualified denial of ever speaking with Winwood about the plaintiff or his candidacy for the CSI Director position. *See, e.g.*, Ahren Dep. at 111:17–20, ECF No. 44-6; Winkowski Dep. at 106:19–21, ECF No. 44-6. Thus, the plaintiff's evidence of any retaliatory motive is virtually non-existent.

Moreover, in *Gilbert v. Napolitano*, 670 F.3d 258, 263 (D.C. Cir. 2012), the D.C. Circuit reiterated that temporality is highly probative in retaliation claims. In that case, the fact that the activity for which the employer was allegedly retaliating occurred "more than three years earlier" and the supervisor was "merely inform[ed] . . . that '[the plaintiff] had a prior EEO activity'" made it nearly impossible for the plaintiff to prove causation. *Id.* The court characterized the

---

[15] The plaintiff's effort to distinguish *Vickers* because it involved an appeal from an administrative law judge's ("ALJ") decision is unavailing. Pl.'s Opp'n at 43 n.39. One portion of the appeal was based on an ALJ opinion, but the ALJ's opinion had nothing to do with the court's determination that the plaintiff failed to provide evidence of pretext. *See Vickers*, 493 F.3d at 192.

three year gap as "long-ago activity" such that "no reasonable jury could infer that mere mention" of it "would give [the employer] a reason to discriminate." *Id.*

In the instant case, the latest alleged protected activity occurred at least seven years prior to the adverse employment action at issue.[16] *See* Pl.'s Opp'n at 39 (noting EEO activity through 2001). The plaintiff also admits that his conversation with Owen regarding his EEO activities was vague. *See* Pl.'s Dep. at 119:8–25, ECF No. 44–6. The plaintiff has done nothing to explain why the holding in *Gilbert* does not apply *a fortiori* here.

Furthermore, the plaintiff attempts to argue that this was the "first opportunity to retaliate against him in a manner tailored to his protected EEO activity." Pl's Opp'n at 42. This claim fails on its face because the plaintiff admits he had not been promoted for other GS-15 positions for which the plaintiff alleges he was qualified and chose only to attack this decision because he perceived it would be "successful." *See* Pl.'s Dep. at 343:22–344:2, ECF No. 52-3 ("I felt that this would be the perfect – if I wasn't selected, that this would be one [action] that I could, you know, be successful in bringing EEO action against the agency for discrimination based on my race being Hispanic, you know, age, and retaliation for, you know, EEO activity."); *see also id.*, at 343:9–13 (stating the plaintiff applied for other GS-15 positions he believed he was qualified

---

[16] Although the plaintiff raised in his complaint as a possible ground for retaliation his participation "as a mediator for a discrimination complaint against CBP," SAC ¶ 11, the plaintiff does not discuss this activity in his opposition, despite the defendant spending considerable time disputing the accuracy of the plaintiff's account in its moving papers. *See* Def.'s Mem. Supp at 17–18. "It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997). Consequently, "a court may treat those arguments that the plaintiff failed to address as conceded." *Buggs v. Powell*, 293 F. Supp. 2d 135, 141 (D.D.C. 2003); *see also Shankar v. ACS-GSI*, 258 F. App'x 344, 345 (D.C. Cir. 2007) (holding that plaintiff conceded the merits of an issue when he "did not respond in any way to defendant's argument" on that issue in his opposition before the district court) (citing LCvR 7(b)); *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do the counsel's work, create the ossature for the argument, and put flesh on its bones . . . . [A] litigant has an obligation to spell out its arguments squarely and distinctly or forever hold its peace.") (quoting *United States v. Zannino*, 895 F. 2d 1, 17 (1st Cir. 1990). Therefore, the "Court shall exercise its discretion to treat the argument" regarding retaliation for the plaintiff's participation in a mediation "as conceded." *See Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 891 F. Supp. 2d 12, 13 (D.D.C. 2012).

for). This wan attempt to explain away the substantial defect in his retaliation claim is simply unavailing. In sum, the evidence does not support the plaintiff's *prima facie* case of retaliation.

## IV. CONCLUSION

The plaintiff is no doubt a qualified program manager, but based upon nearly a year-long period of observing him as an Acting Director, his supervisors determined he did not have the requisite skill set to move on to a higher level of management. While disappointing to the plaintiff, this determination is not indicative of discrimination. Based on the record before it, the Court finds that no reasonable juror could decide that the proffered non-discriminatory reason for the defendant's failure to promote the plaintiff was merely pretextual. Consequently, the defendant's Motion for Summary Judgment is GRANTED.

An appropriate Order will accompany this Memorandum Opinion.

Date: November 5, 2013

_____
BERYL A. HOWELL
United States District Judge